IN THE

## SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW YORK,

IN MAY TERM, 1835—IN THE FIFTY-NINTH YEAR OF THE INDEPENDENCE
OF THE UNITED STATES.

---

## BRADSHAW *vs.* HEATH.

Where, in an action of *ejectment for dower*, in answer to proof on the part of the defendant that the plaintiff, previous to the marriage, by virtue of which she claimed dower, was a married woman, and that her first husband was still alive—the plaintiff produced a record of the superior court of *Connecticut*, containing a sentence of *divorce*, on her petition, from her first husband, and such record *did not state that the husband was served with process, or had notice of the proceeding, or appeared*, but on the contrary, alleged that the adjudication was made on hearing the plea and evidence produced by the plaintiff; and the defendant further proved that the first husband of the plaintiff, at the time of the presentation of the petition and of the granting of the divorce, was an inhabitant of the state of *New York;* IT WAS HELD, that the divorce was void and inoperative here, and that the plaintiff was not entitled to recover dower in any lands of which her second husband died seized, although such divorce was granted 38 years previous to the trial of the action for dower, and 20 years had elapsed since the second marriage.

Although the record of a court of competent jurisdiction of another state granting a *divorce* is conclusive, and entitled to full faith and credit, it is so only as to matters clearly and distinctly stated in it, and not merely inferrible by argument from the judgment : as where the record omits to state that the court had jurisdiction of the person of the defendant, such jurisdiction cannot be inferred from the judgment.

And even where the record does state that the defendant did appear, it is competent to him to controvert the fact, and show that he did not appear, and was not in a situation to receive notice.

At all events a decree of divorce is conclusive only upon parties and privies who acquiesced, and those claiming under them.

THIS was an action of *ejectment for dower*, tried at the Washington circuit in June, 1833, before the Hon. ESEK COWEN, one of the circuit judges.

The plaintiff, Mary Bradshaw, proved her marriage with Thomas Bradshaw, in the year 1813, and that her husband died in possession of the farm in which she claimed dower, and which at the time of the commencement of this suit was possessed by the defendant. The defendant then proved, by the admission of the plaintiff, that in 1784 she was married in the state of *Connecticut*, where she then resided, to *Charles M'Donald*, and that the said Charles M'Donald is now living. The plaintiff thereupon produced an exemplified copy of a record of the *superior Court of Connecticut*, holden at Litchfield, in that state, by which it appeared that in August, 1795, she was divorced *a vinculo matrimonii* as the wife of Charles M'Donald. By the statute law of Connecticut, then in force, divorces might be granted by the superior court, in cases of *adultery, fraudulent contract, wilful desertion* for three years with total neglect of duty, and *seven years absence* of one party, not heard of after due inquiry. The record of the superior court set forth that Mary M'Donald, of New Milford, in the county of Litchfield, had represented to the court her marriage with Charles M'Donald, and that on the 13th December, 1787, he *wilfully deserted her*, and still continued such desertion in the *total neglect of his duty* to her as her husband, wherefore she prayed to be divorced, as per her petition on file, dated 27th August, 1795. The record then proceeds in these words : "This court having heard the plea and evidence by the said Mary exhibited, and produced in proof of the matters of fact in her said petition alleged, are of opinion that they are sufficiently proved, and that she ought to be, and she the said Mary is hereby divorced from him the said Charles, and freed and discharged from all the obligations she is under to him,

by force of the marriage covenants aforesaid." This decree was made on the third Tuesday, being the 18th day of August, 1795. The petition for the divorce, as stated in the decree, in fact bears date on the 27th August, 1795, and besides stating that the husband, in December, 1787, deserted the petitioner, alleges *that he had ever since been to parts unknown* to the petitioner. The counsel for the defendant insisted that the decree of divorce produced by the plaintiff was of no validity in this state, because the record did not show that *Charles M'Donold* had appeared and answered to the application, or had notice of the proceeding, or was within the jurisdiction of the court; but that on the contrary it was fairly inferrible from the petition and record that he had not appeared, and had not notice of the proceeding. The circuit judge ruled that the record was sufficient evidence of the divorce, and that he would intend that all necessary preliminary steps had been taken to render the divorce valid, unless the contrary was shown. The defendant then proved that *Charles M'Donald* and his wife, shortly after their marriage, removed from New-Milford, in Connecticut, and that the plaintiff had stated that they went to reside at *Bedford*, or Fredericksburgh, in the state of New York, where she said her husband had left her, and she did not know where he was gone. The witness who testified to these facts stated that he was a near neighbor of the plaintiff's father, and was well acquainted with him and his family; that after M'Donald and his wife had been gone some time, her father went and brought her back to New-Milford, she then having a son with her; and that her husband, Charles M'Donald, never afterwards returned to Connecticut. M'Donald had studied medicine, and was called *Dr. M'Donald*. It was further proved, that in 1791 an individual, called *Dr. M'Donald*, taught a school in *Bedford*, in the county of Westchester, in the state of New York; that he afterwards removed to *New-Castle*, in the same county, and subsequently returned to *Bedford*, where he resided in 1795, and continued to reside until 1803, when he removed to *Rye*, in the same county, where he resided until 1818. *Bedford* is about 50 miles distant from *New-Milford*. The

NEW YORK, defendant proved that *William M'Donald*, Esq. of Glen's Falls, May, 1835. is the son of the plaintiff, whom she had with her when her
Bradshaw   father took her home to New-Milford, and *offered to prove* that
v.       *the* Dr. M'Donald spoken of by the witnesses as residing at
Heath.    Bedford, New-Castle and Rye, was *generally reputed* to be
the father of *William M'Donald* Esq. of Glen's Falls; which
evidence was objected to and rejected by the judge. The de-
fendant olso *offered to prove* that previous to and at the time
of the plaintiff's application for a divorce, it was a frequent sub-
ject of conversation in the family of the plaintiff's father, and
while the plaintiff resided with her father, that her husband,
*Charles M'Donald*, then resided in the state of New York;
which evidence was objected to and refused to be received by
the judge, unless it was proved that the plaintiff was present
at such conversations, and assented to what was said by the
persons who spoke on the subject. The counsel for the de-
fendant then insisted, that as it did not appear by the record
of the divorce that Charles M'Donald had appeared and an-
swered to the petition for a divorce, or that he had notice of
the proceeding, the fact of the place of his residence at the time
of the application for and the granting of the divorce should be
passed upon by the jury; that is, that the question whether,
at the time he resided in the state of *New York*, or in the state
of *Connecticut*, should be submitted for their determination;
for if he resided at the time in New York, the divorce was void.
The judge decided that there was no evidence to be submitted
to the jury; that the defendant had wholly failed to show
that *Charles M'Donald* was out of the state of Connecticut
at the time of the granting of the divorce; and therefore he re-
fused to submit the question to them, but instructed them to
find a verdict for the plaintiff, which they did accordingly.
The defendant asks for a new trial.

*O. Clark & R. Weston*, for the defendant. The docu-
mentary evidence produced by the plaintiff to show the grant-
ing of a divorce is not entitled to be considered as a *record* or
*judicial proceeding*. It has no *placita*, it sets forth no plead-
ings, it does not allege that the husband *appeared* in the pro-
ceeding, it gives him no day in court, nor is it alleged that
day was given and that he made default. It has not the

signature of a judge or officer of a court. It merely sets forth the presentation of a petition, an *ex parte* hearing of the petitioner, and a judgment of divorce ; granted, too, at the *same term* in which the petition was presented. On the other hand, it is fairly inferrible, from the very documents produced, that the husband had not notice of the proceedings, and did not appear. The petitioner states that he was *gone to parts unknown*, and the record shows that the hearing before the court was an *ex parte* hearing, and not a hearing of both parties. In addition to which, from the evidence adduced and offered to be given, it is manifest that Charles M'Donald, the husband of the plaintiff, at the time of the granting of the divorce, was a citizen of, and resident in the state of *New York*, and not a resident in *Connecticut*. If he was a citizen of this state, and did not appear in the court in Connecticut when the divorce was granted, in person or by attorney, and had not notice of the proceedings, the divorce is void and inoperative, and cannot be enforced in this state, 6 *Wendell*, 447, 13 *Johns. R.* 208, 15 *id.* 123. The divorce is void also on the ground that Charles M'Donald and his wife being citizens of this state, the wife could not proceed to Connecticut and obtain a divorce, *a vinculo matrimonii*, for a cause which, by the laws of this state, would not have entitled her to such divorce. She obtained a divorce for the cause that her husband had deserted her for three years, whereas here a divorce could have been obtained only for the cause of *adultery*. During coverture the wife could not acquire a *domicil* distinct from that of her husband. Her domicil, therefore, as well as that of her husband, was in this state. It is true the parties were married in Connecticut, but the contract of marriage is *personal*, and follows the parties wherever they go, and they can ask under it only what the laws of the place where they reside allow. The counsel cited 19 *Johns. R.* 162, 4 *Cowen*, 292, 5 *Wendell*, 148, 9 *Mass. R.* 462, *Kirby's R.* 119, 6 *Pick.* 245, 3 *Wilson*, 197. The counsel also insisted that the proof offered on the trial ought to have been received.

*W. Hay*, for the plaintiff. The record of the decree of divorce is sufficient. It states that the judgment was rendered at

NEW YORK, a superior court holden at Litchfield, in the county of Litchfield,
May. 1835. and state of Connecticut, on, &c.  It does not allege that the

Bradshaw
v.
Heath.

proceedings were had *before the judges* of the court, but they
necessarily must have been before the judges, for a court can-
not exist without judges.  The record has no *placita;* nor does
it purport to be signed by a judge of the court: the first is un-
necessary, unless required by statute, and the signature of a
judge to a record is mere matter of practice.  The plaintiff
and her husband Charles M'Donald, at the time of their mar-
riage, were citizens of *Connecticut*, and entered into the mar-
riage, contract with reference to the law of that state on the
subject of divorces, which entered into and formed part of the
marriage contract.  Her husband's conduct was such as en-
titled her to a divorce, and she appealed to the laws of Con-
necticut for relief, and it was granted.  This divorce must
be held valid, or it will always be in the power of the hus-
band by change of domicil to deprive the wife of her rights.
A judgment *in personam* it is admitted is of no validity, un-
less the party to be affected by it *appears* as a party upon the
record, or has *notice* of the proceeding ; but this was a *pro-
ceeding in rem*, and in such proceedings *actual* notice is not
necessary ; all that is required is *constructive notice*.  Of this
character are proceedings *against absent* and *absconding*
debtors, and all the variety of cases in which *attachments* are
issued against property.  What is enough to put a party up-
on inquiry, is constructive notice ; M'Donald knew that his
wife was in Connecticut, and having taken no measures to re-
verse the decree of divorce for the period of 38 years after it
was granted, and for 20 years subsequent to the second mar-
riage of his wife, it must be presumed that he had notice of
the proceeding and acquiesced in the decision.  The presump-
tion of law is, that the court which granted the divorce pro-
ceeded regularly, and if *notice* was necessary, that such notice
was given ; and especially ought such presumption to prevail,
after the lapse of so many years.  The record is conclusive.
The plaintiff could not have been prosecuted for polygamy in
Connecticut, 1 *Conn. R.* 459, 4 *Day*, 303, 1 *id.* 111, 8 *Conn.
R.* 541 ; and under the constitution and the act of congress,
in reference to the records and judicial proceedings of other

states, full faith and credit should be given here to the record, and the divorce adjudged to be valid and operative. The evidence offered to show that Charles M'Donald was not in *parts unknown* was inadmissible, because tendering to show that the decree was obtained by fraud. The plaintiff had alledged in her petition that he was in parts unknown, and the petition was adjudged true by the court ; the evidence offered was therefore improper. Fraud, practiced upon a court rendering a judgment, can be inquired into only by such court, and is not the subject of inquiry by another court in which such judgment is sought to be enforced. This evidence, therefore together with the other proof offered by the defendant and rejected by the judge, was correctly excluded.

NEW YORK,
May, 1835.

Bradshaw
v.
Heath.

*By the Court*, SAVAGE, J. The plaintiff claims as the widow of Bradshaw. Having been previously married to Dr. M'Donald, who is still living, she could not have been the lawful wife of Bradshaw, unless, before her marriage with him, she had been legally divorced from M'Donald. Whether she was so divorced, is the main question in the cause. To prove the divorce, she produces a record of the superior court of Connecticut, and by it the proceeding appears to have been entirely *ex parte.* It is not alleged in the record that *notice* was given to the husband, nor is there any appearance by him. The judgment of the court also appears to have been rendered nine days *before* the petition was presented praying for such judgment. This is probably to be reconciled by the practice of considering the term as but one day ; but if so, still the judgment appears to have been pronounced *instanter* upon the presentation of the petition. The record recites that the court had heard the plea and evidence of the said Mary, but it is not alleged that the husband appeared, or was served with process or had notice, either *actual* or *constructive*, by the service of an attachment upon any article of property alleged to be his. In addition to the facts already mentioned, it was proved that soon after the marriage, the plaintiff and her husband removed from the state of Connecticut to *Bedford in the state of New York*, and after they had been gone some time, the plaintiff's father went after her and brought her home to *New-*

NEW YORK, *Milford in Connecticut.* The husband, M'Donald, never re-
May, 1835.
turned to Connecticut, but remained, as is inferrible from the
Bradshaw  testimony, in Bedford and that vicinity until 1795, and long
v.
Heath.   after. The evidence is not conclusive, perhaps, on this point ;
but, uncontradicted, it certainly was sufficient to authorize the
jury to find the fact. The husband was Dr. M'Donald ; he is
shown to have moved from New-Milford to Bedford ; a per-
son of that name and profession is shown to · have resided in
and near Bedford for many years, and there is no evidence
concerning any other Dr. M'Donald ; the inference, therefore,
is, that he is the same person, and I think the evidence is *pri-
ma facie* sufficient to prove it in a case like the present. But
whether the husband remained in Bedford, was only material
to show the fact that in 1795, when the divorce was granted,
he was not in Connecticut, within the jurisdiction of the court
which granted the divorce.    That fact I consider proved *pri-
ma facie,* without locating him in Bedford. The witness says
M'Donald never returned to Connecticut, and that the plain-
tiff told him that she did not know where he had gone. The
husband having been proved to have changed his domicil,
before the divorce, it was incumbent on the plaintiff to have
shown his return, or he must be presumed to have remained
out of the state of Connecticut. As the fact of the husband's
absence was material in the decision of the case, the judge
should have submitted the evidence to the jury. I shall,
therefore, in further discussing this subject, consider the fact
of the husband's absence as proved, and also that he did not
appear, and had not any notice of the proceedings to obtain a
divorce.

Were this a civil suit between the parties of the divorce,
and the evidence such as I have stated, all the adjudications
agree that a judgment so obtained cannot be enforced. The
earliest American case affecting the question is a case in the
same court, which pronounced the judgment of divorce in
this case. *Kibbe* v. *Kibbe, Kirby's R.* 119, 126. That was an
action of debt upon a judgment obtained in Massachusetts.
Process had been issued in that case, and a handkerchief at-
tached as the defendant's property, and a copy of the process
had been left at the defendant's house, in Connecticut. The

court decided that the judgment in Massachusetts was void for want of jurisdiction, the defendant not being an inhabitant of Massachusetts, nor within the jurisdiction of the court where the pretended notice was given. They then laid down a rule which, since the case of *Mills* v. *Duryee, 7 Cranch*, 481, has been uniformly considered correct, that full faith and credit ought to be given to judgments of the courts of any of the United States, when both parties are within the jurisdiction of the court, where the suit was commenced, where the defendant was served with process, and had or might have had a fair trial of the cause. This case was decided in 1786. The next case in the same court is *Smith* v. *Rhoads*, 1 *Day*, 168. That was an action upon a judgment in Massachusetts, and it appeared from the pleadings that although the defendant resided in Connecticut, yet he had notice of the suit, and appeared therein and defended the same ; the court held the judgment conclusive. The case of *Sanford* v. *Sanford*, 5 *Day*, 356, was decided on the same ground. A divorce was granted in that case, although the defendant resided in Albany, in the state of New York ; but he appeared by attorney and defended the suit. On error, brought to the supreme court of errors, the judgment was affirmed, the court laying stress upon the fact that the defendant was not nominally, but *actually in court*. This, they say, gave the court jurisdiction, as a court of chancery, to pass a decree *in personam*. The case of *Aldridge* v. *Kinney* 4 *Conn. R.* 380, decided in 1822, was an action brought in Connecticut, upon a judgment in Rhode Island, in which the defendant had no notice, nor was served with process, nor did he appear, being an inhabitant of Connecticut, and the suit commenced by attaching certain turnpike shares. Chief Justice Hosmer reviews most of the cases then published, and asks what is intended by "the records and judicial proceedings of any other state," to which full "faith and credit shall be given ;" and remarks that these words are sufficiently comprehensive to embrace every judgment *in fact*, but that they may rationally be satisfied by an application to such judgments as are duly rendered against those who appeared or were legally notified to appear. He maintains that nothing can be more preposterous and absurd,

NEW YORK, nothing more contrary to reason and justice, than to hold a
May, 1835. man invincibly bound by a judgment rendered against him
Bradshaw without notice. Such is the law in Connecticut. It is substan-
v. tially the same in Massachusetts, in Pennsylvania, in New-
Heath. York, and several other, probably in all the states. 9 *Mass. R.*
462. 6 *Pick.* 232. In *Bissell* v. *Briggs,* Chief Justice Par-
sons considers a judgment in another state in two points of
view : 1. To justify its execution in the state where render-
ed, and 2. To obtain execution from the courts of other states.
In the first it is sufficient that the proceedings were had ac-
cording to the practice in that state, whether notice was ac-
tually given or not. Thus, where property is attached in
one state, the owner living out of the jurisdiction of such
state, and not being within its jurisdiction, nor amenable to its
laws, the judgment is good *as to the property attached* with-
in the jurisdiction of the court rendering the judgment. So
far it is a proceeding *in rem.* But as to the second particu-
lar, when the plaintiff in such judgment seeks to enforce it
against the person, by obtaining execution through the courts
of the state where the defendant resides, then the defendant
has a right to show that the court rendering the judgment
against him never had jurisdiction of his person ; and there-
fore, as to any such remedy, the judgment is void. This is
perfectly consistent with the point decided in *Mills* v. *Duryee,*
7 *Cranch,* 481. Mr. Justice Story, who delivered the opinion
of the court in that case, remarks, that in that case the defend-
ant had full notice of the suit, for he was arrested and gave
bail. Since the decision of *Mills* v. *Duryee,* I believe it has
never been considered as extending to conclude any defendant
who never had any notice of the suit, and who was not an
inhabitant of the state in which the judgment was entered, and
did not appear by an attorney. That in such cases the record
is not conclusive, has been decided in this court very fre-
quently. Some of the cases are the following : *Borden* v.
*Fitch,* 15 *Johns. R.* 121 ; *Shumway* v. *Stillman,* 4 *Cowen,*
294, *and* 6 *Wendell,* 447, *S. C. ; Andrews* v. *Montgomery,*
19 *Johns. R.* 162, *and Starbuck* v. *Murray,* 5 *Wendell,* 154.
    It is said, however, that the proceeding to obtain a divorce
in Connecticut is like a *proceeding in rem,* or proceedings in

the ecclesiastical courts in England, which are conclusive as to matters adjudicated in them. Proceedings *in rem* are those wherein certain *things* are seized or attached, and the judgment is *conclusive as to the title of the property so attached*, and sold by virtue of the proceedings consequent upon such seizure or attachment. The case of *Scott* v. *Shearman*, 2 *Black.* 977, in 1774, exemplifies this principle. There an action of trespass was brought against certain custom house officers for taking the plaintiff's goods. The defendants gave in evidence the condemnation of the same property in the court of exchequer. The court held that the condemnation in the exchequer was conclusive. Mr. Justice Blackstone assigned his reasons; which were, 1. Because of the credit which the law gives to a judgment of a court of record having jurisdiction of the subject matter; 2. Because the property of the goods becomes changed and vested in the crown by the condemnation. To the argument that no notice was given to the owner in person, he answers that the seizure is notice to the owner, for he is presumed to know what becomes of his goods; he knew by the proclamations made according to the course of the court, and the writ of apppraisement which must be publicly executed. But in the case of *Fisher* v. *Lane*, 3 *Wils.* 297, (in 1772,) where an action was brought in the same court, before the same judges, for an admitted debt, and the defence consisted of a judgment rendered upon process of foreign attachment in London, and of which no notice was given to the plaintiff Fisher, which was according to the custom of the city court, Chief Justice De Grey said that customs may deviate from the course of the common law, but a custom not to summon or give notice to a defendant, in a suit commenced against him, is contrary to the first principles of justice, and cannot be good; and the defence was excluded. So in *Buchanan* v. *Rucker*, 9 *East*, 192, assumpsit was brought in the king's bench, upon a foreign judgment in the island of Tobago. The record contained an entry that the defendant, of the city of London, was summoned to appear, by nailing up a copy of the declaration at the court house door, on which judgment was afterwards entered by default. It

NEW YORK, was objected that the judgment had been entered without
May, 1835. any notice to or appearance by the defendant, and it was con-

Bradshaw    tended that therefore the judgment was a nullity ; and so
   v.       Lord Ellenborough decided, although it was alleged that such
Heath.      was the practice in Tobago ; and the plaintiff was nonsuited.
On a motion to set aside the nonsuit, it appeared that the
service of the declaration was according to the law of the isl-
and of Tobago, with respect to persons absent from the island.
Lord Ellenborough held, that by those *absent from the island*,
was meant those who had been subject to the jurisdiction of
the courts there ; and as that fact was not shown, no assump-
sit could be raised upon a judgment so obtained.    This case
is not altogether analogous to the present, for it does not ap-
pear that Dr. M'Donald was within the state of Connecticut
in 1784, but there is nothing to show that he was ever there
after he changed his domicil and removed from the state.
This case also shows that it is proper to look into the record
to see what notice was given to the defendant, and thereby
determine whether the court had jurisdiction of the person
of the defendant. Where it appeared, as in this case, that the
court had no jurisdiction of the person of the defendant, the
judgment was declared a nullity, and could not be enforced.
In the cases in this court which have already been cited, it
has been decided that, although it appears by the record that
the defendant appeared, yet he may by testimony controvert
that fact, and show that he did not appear, and was not in a
situation to receive notice ; and in such case the record is in-
effectual, and no action can be sustained upon it. In *Kilburn*
v. *Woodworth*, 5 *Johns. R.* 37, a judgment was obtained in
Massachusetts, in a suit commenced by attaching a bedstead.
A suit being brought in this court, it was held that the judg-
ment could only be good as a proceeding *in rem*, but not the
ground of an action here. To bind a defendant personally by
judgment, where he was never summoned or had notice
of the proceedings, would be contrary to the first principles of
justice. It would seem to follow, that where the record shows
no jurisdiction over the person of the defendant, but the con-
trary is necessarily implied, such record is a nullity and in-
sufficient to support an action.

The opinion of Chief Justice De Grey, in the *Duchess of* *Kingston's case,* is often referred to as laying down the rule as to the conclusiveness of records. I will state some of the facts of that case, and some of the remarks of that learned judge. The person known as the dutchess of Kingston was originally Elizabeth Chudleigh ; she was married in 1744, to one Hervey, (afterwards earl of Bristol.) In 1768 she instituted a suit of jactitation of marriage against Mr. Hervey, in the court of the bishop of London. This proceeding is applicable in England, where one *boasts* or gives out that he or she is married to the other. The injured party may libel the other, and unless he proves actual marriage, he is enjoined perpetual silence on that head. In the case of *Elizebeth Chudleigh* v. *Hervey,* such proceedings were had, that in February,1769, sentence was pronounced, that the said Elizabeth Chudleigh was and now is a spinster, and free from all matrimonial contracts with said Hervey. In March following she was married to the duke of Kingston. In January, 1775, she was indicted for polygamy ; the indictment was removed into parliament, and in April, 1776, she was brought to trial before the house of lords. She pleaded not guilty, and insisted upon the decree in her favor, in the suit before the bishop of London, as conclusive evidence of the fact that she never was married to Mr. Hervey, and that no other evidence ought to be received respecting the pretended marriage. The question as to the conclusiveness of the record was argued at great length and with great ability. Lord Chief Justice De Grey, chief justice of the common pleas, gave the unanimous opinion of the judges. After stating, as a general rule, to which there are some exceptions, that judicial proceedings, although evidence against the parties and all claiming under them, are not evidence against strangers, he proceeds to draw from the cases which had been referred to upon the argument two deductions : 1. That the judgment of a court of concurrent jurisdiction directly upon the point, is, as a plea, a bar, or as evidence conclusive, between the same parties, upon the same matter directly in question in another court ; 2. That the judgment of a court of exclusive jurisdiction, directly upon the point, is, in the like manner, conclusive upon the same

matter, between the same parties, coming incidentally in question in another court. But neither the judgment of a concurrent or exclusive jurisdiction is evidence of any matter which came collatterally in question, though within their jurisdiction ; nor of any matter incidentally cognizable ; nor of any matter to be inferred by argument, by the judgment. He proceeds to remark that the spiritual court has the sole cognizance of deciding directly the question of marriage ; but the temporal courts have the sole cognizance of deciding questions of property, and, in their investigations in such cases, have the power of deciding incidentally the fact and the legality of marriages. But when they have found the question directly decided by the ecclesiastical courts, they receive it as evidence of the fact, in the same manner as they receive the acts of other courts. Hence, he says, a sentence of nullity and a sentence of affirmance of marriage have been received as conclusive evidence, on a question of legitimacy arising incidentially upon a claim to real estate. So a direct sentence, in a suit upon a promise of marriage, against a contract, has been admitted as evidence against such contract, in an action brought upon the same promise for damages, it being a direct sentence of a competent court, disproving the ground of the action. So a sentence of nullity is equally evidence in a personal action against a defence founded upon a supposed coverture. *But in all these cases the parties to the suits, or at least the parties against whom the evidence was received, were parties to the sentence, and had acquiesced under it, or claimed under those who were parties and had acquiesced.* He proceeds to show that proceedings in ecclesiastical courts cannot be evidence in criminal suits; and even if they should be in civil suits, yet that a cause of jactitation, being in the nature of a cause of defamation only, the sentence has only a negative and qualified effect, to wit, that the party has failed in his proof, and that the libellant is free from all matrimonial contract *as far as yet appears*—being inconclusive in the same court, and cannot of course conclude any other court. It was therefore decided that a sentence in a spiritual court against a marriage, in a suit of jactitation of marriage, is not conclusive evidence so as to stop the counsel of the crown from proving the marriage in an indictment

for polygamy. 2 *Macnally's Ev.* 430 *to* 462. 2 *St. Trials,*201,
262. I have been thus particular in stating this case, that it
might be seen what was the question before the judges, and
with what qualifications general propositions are advanced.
If we apply the doctrine of the preceding case to the case now
under consideration, it will establish the point that the fact of
divorce is proved by the proceedings of a court of competent
jurisdiction ; but the record is no evidence of the jurisdiction
of the court over the person of the defendant in those proceed-
ings, because no fact is stated in the record giving such juris-
diction ; and if it is inferrible at all, it is so only by argument
from the judgment ; and at most it is only to be received as
against the parties to that suit, or those who claim under them
and had acquiesced under it. The defendant in this case was
neither party nor privy to that suit, nor does he claim under a
party or privy.

It does not become necessary to agitate the difficult ques-
tion, under what circumstances the courts of the several states
have a right to grant divorces, which shall be operative in
the other states. We have as yet no adjudications from which
any general rules can be considered as established. Our re-
vised statutes have laid down rules for the government of our
own courts, and the legislatures of other statutes have done the
same in respect to their courts. Several cases however have
arisen, in which courts have declared divorces granted in oth-
er states inoperative and void out of the states in which they
were granted, to which I will refer. In the case of *Jackson* v.
*Jackson,* 1 *Johns. R.* 424, the parties were married in this
state in September, 1800 ; they resided here and lived to-
gether until the winter of 1802. In October, 1802, the
plaintiff (the wife) went to Vermont for the express purpose
of obtaining a divorce ; in April, 1803, she returned, having
in February preceding obtained a divorce, discharging her
from the marriage covenant, and awarding to her alimony to
the amount of $1500—to recover which that suit was brought.
The ground upon which the divorce was granted was ill treat-
ment and severity of temper ; for which causes the laws of Ver-
mont authorized a divorce *a vinculo,* when, by the laws of this
state, where the contract was entered into, and where the par-

ties resided, no such divorce could be granted, except for adul-tery. This court gave judgment for the defendant, on the ground that the procuring a divorce in Vermont was a fraud upon our own laws. But, upon principle, how was it possible to sustain the judgment rendered in Vermont 2. The contract was not made there, nor was it made in reference to the laws of Vermont ; nor were such laws violated ; nor were the parties resident there. Both parties, indeed, appeared there, and therefore the court had jurisdiction of the persons of the parties ; but this court refused to enforce the judgment. A question nearly similar was presented in *Pawling* v. *Bird's Ex'rs*, 13 *Johns. R.* 208. There the divorce took place in Connecticut ; both parties appeared and contested the divorce, though inhabitants of this state at the time of the divorce ; the question, however, was not decided, as the defendants were entitled to judgment upon other grounds. In *Borden* v. *Fitch*, 15 *Johns. R.* 140, the validity of a divorce in Vermont again came up for consideration. The action was for debauching the plaintiff's daughter ; the evidence was, that the defendant married her and cohabited with her in 1814. The defendant had been married in 1784, in Connecticut, and resided there until 1807, when his wife, Charlotte Sellick, applied to the legislature, and obtained a divorce from him *a mensa et thoro*, and he was ordered to pay her $150 annually. In 1813, the defendant obtained in Vermont a divorce *a vinculo matrimonii*, but it did not appear that personal notice had been given to the wife. The record recited that she had been duly notified to appear and show cause, &c.; the law only required notice in the newspapers. Chief Justice Thompson, in giving the opinion of the court, said, that to sanction such a divorce was contrary to the first principles of justice ; that a judgment could have no validity, unless the court had jurisdiction both of the person and the subject matter ; and want of such jurisdiction rendered it void and unavailable for any purpose. He further declares it to be the settled law of this state, that a judgment obtained in a sister state, against a person not being within the state, nor served with notice, nor appearing, is absolutely void. This principle, he says, must apply equally to a divorce as to any other

judgment; and he insists that the case of *Mills* v. *Duryee*, is not applicable to a judgment void according to the first principles of justice. A divorce, obtained under similar circumstances, was declared void in Massachusetts. 14 *Mass. R.* 230, 1. In *Hopkins* v. *Hopkins*, 3 *Mass. R.* 158, the supreme court of Massachusetts decided that a suit for a divorce would not be sustained, where the parties lived in another state, and one of them committed adultery there, and the injured party had subsequently removed into Massachusetts, and there brought her suit. The court said they would have sustained the libel, if the parties had resided in that state before the offence was committed, although such offence was committed without their jurisdiction.

In the case of *Barker* v. *Root*, 10 *Mass. R.* 260, a divorce obtained in Vermont, both parties being domiciled there, was held valid, although the contract of marriage was entered into in Massachusetts. Mr. Justice Sewall remarked that the *lex loci*, which is to govern married persons, and by which the contract is to be annulled, is not the law of the place where the contract was made, but where it exists for the time; where the parties have their domicil, and where they are amenable for any violation of their duties in that relation. In *Jackson* v. *Jackson*, 1 *Johns. R.* 432, it was said by Mr. Justice Spencer, in giving the opinion of the court, that the wife was incapable during coverture of obtaining domicil distinct from that of her husband. He refers to 5 *Vesey, jun.* 787, where it was decided that a son, who was a minor, could not acquire a domicil distinct from his father, because he was not *sui juris*. If we consider the plaintiff in this case as domiciled in New York, when she applied for and obtained a divorce in Connecticut, then the divorce there should not be considered of any validity. The contract, according to Mr. Justice Sewall, was such as consisted with the law of New York when the parties resided here. Desertion for three years was no cause of divorce in New York, in which state, if at all, the desertion took place. The parties being domiciled here, the offence, if any, having been committed here, was not, according to the argument of Mr. Justice Sewall, such a violation of contract as to justify a divorce here, and of

course not in Connecticut. On this question, it is not necessary now to give any opinion. It is enough at present to decide that the record was not conclusive—Dr. M'Donald being out of the state of Connecticut, not having appeared, nor having had notice of the proceedings.

There were some minor questions arising upon the trial which should be disposed of. The judge was right in rejecting evidence of conversations in the family of the plaintiff's father as to the residence of Dr. M'Donald; his residence was the fact to be proved. The plaintiff,s admissions would be evidence, but not the declarations of other persons, unless in her presence, and under circumstances which would imply her assent; the declarations of others, under any other circumstances, would be hearsay merely. The question whether *the* Dr. M'Donald proved to have resided in Westchester county was reputed to be the father of W. M'Donald of Glen's Falls, I think, should have been answered. The object was not to prove pedigree, and thereby show title to an estate, but to prove a fact which was important in the case. It had been shown that W. M'Donald, Esq. was the son of the plaintiff. The fact to be ascertained was, whether *the* Dr. M'Donald spoken of by the witnesses was the father of W. M'Donald, Esq. Such a person was shown to have resided in Westchester at the time the divorce was obtained. If he was the husband, then the divorce was void; and if he was the father of W. M'Donald, then his identity was proved. The fact of paternity is one to be proved by reputation. No person can swear positively to that fact but the mother. It is true, indeed, that had W. M'Donald himself been called, he might have been asked what his mother, the plaintiff, had told him on that subject; but this, I apprehend, is one of those cases where reputation is sufficient. This point, however, I do not consider important, as in my opinion there was without it testimony enough, to warrant a jury in finding that the husband was without the state of Connecticut, at the time of the divorce, which was the fact to be proved.

New trial granted; costs to abide the event.